**Case No. 24-12925**

---

# In the United States Court of Appeals
# For the Eleventh Circuit

---

KEITH EDWARDS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
JERRY BLASINGAME, DECEASED,

*Plaintiff-Appellant,*

v.

OFFICER J. GRUBBS, #6416, AND
CITY OF ATLANTA/ATLANTA POLICE DEPT.

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA – ATLANTA DIVISION

No. 1:19-cv-2047 (Honorable Steve C. Jones)

---

**PLAINTIFF-APPELLANT'S BRIEF ON APPEAL**

---

Christopher P. Desmond (P71493)
Ven Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
Tel: (313) 321-8300
cdesmond@venjohnsonlaw.com

*Counsel for Plaintiff-Appellant Keith Edwards, as Personal
Representative of the Estate of Jerry Blasingame, deceased*

*Keith Edwards v. J. Grubbs, et al.*, Record No. 24-12925

**CERTIFICATE OF INTERESTED PERSONS**

Plaintiff-Appellant certifies that the following persons and entities have an interest in the outcome of this action:

-Atlanta Police Department

-Blasingame, Jerry Estate of (Plaintiff-Appellant)

-City of Atlanta

-Dearing Jr., James E. (Counsel for Defendant-Appellee)

-Desmond, Christopher P. (Counsel for Plaintiff-Appellant)

-Eason, Kimberly Delk (Counsel for Defendant-Appellee)

-Edwards, Keith (Plaintiff-Appellant)

-Grubbs, Jon (Defendant-Appellee)

-Hatchett, Ayanna D. (Counsel for Plaintiff-Appellant)

-Hill, Alexander J. (Counsel for Defendant-Appellee)

-Johnson, Vernon R. (Counsel for Plaintiff-Appellant)

-Jones, Steve C. (District Court Judge)

-Melton, Harold D. (Counsel for Defendant-Appellee)

-Miller, J. Stacy (Counsel for Defendant-Appellee)

-Peeler, Charles E. (Counsel for Defendant-Appellee)

-Pierre, Hermise

-Tobin, Darren M. (Counsel for Plaintiff-Appellant)

*Keith Edwards v. J. Grubbs, et al.*, Record No. 24-12925

-Waldbeser, Elizabeth P. (Counsel for Defendant-Appellee)

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

/s/ Christopher P. Desmond
*Counsel for Plaintiff-Appellant*

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiff-Appellant Keith Edwards, as Personal Representative of the Estate of Jerry Blasingame, deceased, respectfully requests oral argument. This appeal is highly fact-intensive, as it arises out of a nearly two week long trial that culminated in a $100 million dollar verdict in Plaintiff's favor. Oral argument will assist the Court with its understanding of the record and with its ultimate determination.

# **TABLE OF CONTENTS**

Certificate of Interested Persons ....................................................C1

Statement in Support of Oral Argument ........................................... i

Table of Authorities ....................................................................... iii

Jurisdictional Statement ................................................................. 1

Statement of Issues........................................................................ 2

Statement of the Case..................................................................... 3

Standard of Review........................................................................ 22

Summary of the Argument............................................................. 22

Argument........................................................................................ 24

      The District Court erred in granting Defendant's
      Motion for Judgment as a Matter of Law relating to
      municipal liability .................................................................. 24

      The District Court improperly granted Defendant's
      request for remittitur relative to the punitive damage award ............ 34

      The District Court erred in denying Plaintiff's
      Motion for Relief from Judgment relative to his claim
      under O.C.G.A. § 42-5-2 ...................................................... 48

      The District Court erred in denying Plaintiff's motion
      for costs and fees as the prevailing party............................. 50

Conclusion ..................................................................................... 52

Certificate of Compliance .............................................................. 53

Certificate of Service ..................................................................... 53

## TABLE OF AUTHORITIES

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ........................................................................ 24

*Anderson v. Eagle Motor Lines, Inc.*,
423 F.2d 81 (5th Cir. 1970) ........................................................... 47

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) ........................................................................ 39

*Casillas-Diaz v Officer Romualdo Palau*,
463 F3d 77 (1st Cir., 2006) ............................................................ 45

*Cherokee County v. N. Cobb Surgical Assocs., P.C.*,
221 Ga. App. 496 (1996) ........................................................... 48-50

*City of Canton v. Harris*,
489 U.S. 378 (1989) ..................................................................... 25-27

*Connick v Thompson*,
563 U.S. 51 (2011) .......................................................................... 30

*Cruz v City & Co of Denver*,
___F Supp 3d___ (D Colo, Dec. 18, 2023) .................................... 32

*Del Casal v. Eastern Airlines, Inc.*,
634 F.2d 295 (5th Cir. Unit B 1981) .............................................. 47

*Doe v Celebrity Cruises, Inc*,
394 F3d 891 (CA 11, 2004) ............................................................ 22

*Epps v City of Denver*,
2022 U.S. Dist. LEXIS 35895 (March 1, 2022) ........................ 30, 32

*Estate of Moreland v Dieter*,
395 F3d 747 (7th Cir., 2005) .......................................................... 47

*Farr v CTG Hospitality Group, LLC*,
___F Supp 3d___ (ND Ga, Mar. 13, 2024) .................................... 32

*Farrar v. Hobby,*
506 U.S. 103 (1992) ...................................................................... 51

*Gold v City of Miami,*
151 F3d 1346 (11th Cir., 1998)................................................27-28

*Goldsmith v. Bagby Elevator Co., Inc.,*
513 F.3d 1261 (11th Cir.2008) ................................................39-40

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ...................................................................... 51

*Hewitt v. B.F. Goodrich Co.,*
732 F.2d 1554 (11th Cir. 1984) .................................................... 34

*Jennings v Fuller,*
___F Supp 3d___ (ED Mich, May 23, 2017) ........................45-46

*Johansen v. Combustion Eng'g, Inc,*
170 F.3d 1320 (11th Cir., 1999) ................................................... 36

*Johnston v Borders,*
2019 U.S. Dist. LEXIS 228218 ..................................................... 37

*Jones v Louisville/Jefferson County Metro Gov't,*
482 F.Supp.3d 584 (2020) ........................................................31-32

*La-Forest v. Autoridad de las Fuentes Fluviales,*
536 F.2d 443 (1st Cir.1976)........................................................... 47

*Lewis v City of West Palm Beach,*
561 F.3d 1288 (2009)..................................................................... 27

*Machado v. States Marine-Isthmian Agency, Inc.,*
411 F.2d 584 (5th Cir. 1969) ........................................................ 47

*Macon-Bibb County Hosp. Auth. v. Reece,*
228 Ga. App. 532 (1997) ............................................................... 48

*Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty.,*
207 Ga. App. 530 (1993) ..........................................................49-50

*McNabola v Chicago Transit Auth.*,
10 F.3d 501 (7th Cir. 1993) ......................................................................... 37

*Monroe v. Pape*,
365 U.S. 167 (1961) ...................................................................................... 24

*Parker v Randolph*,
442 U.S. 62 (1979) ........................................................................................ 38

*Reeves v. Town of Cottageville*,
#2:12-cv-02765, U.S. Dist Ct., (D.S.C. Oct. 21, 2014) ............................... 46

*Rose v Baltimore Co*,
___F Supp 3d___ (D Md, Aug. 23, 2024) ................................................... 32

*Rosell v. VMSB, LLC*,
67 F.4th 1141 (11th Cir. 2023) ................................................................20-21

*Saylor v. Barrow County*,
2010 U.S. Dist. LEXIS 154614 (N.D. Ga. Mar. 9, 2010) ........................... 49

*Sepulved*a v. Burnside,
432 F. App'x 860 (11th Cir.2011) ................................................................ 40

*State Farm Mut. Auto. Ins. Co. v Campbell*,
538 U.S. 408 (2003) ...............................................................................39-43

*Tru-Art Sign Co. v. Local 137 Sheet Metal*,
852 F.3d 217 (2d Cir. 2017) ......................................................................... 37

*TXO Prod. Corp. v. Alliance Res. Corp.*,
509 U.S. 443 (1993) ...................................................................................... 40

*U.S. E.E.O.C. v. W&O, Inc.*,
213 F.3d 600 (11th Cir. 2000) ...................................................................... 40

*Vineyard v. Co of Murray*,
990 F.2d 1207 (11th Cir., 1993) ................................................................... 29

## JURISDICTIONAL STATEMENT

**District Court:**  The United States District Court for the  Northern District of Georgia had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as it involves a federal question.   Specifically, Plaintiff alleged that defendants violated Mr. Blasingame's Fourth Amendment rights to be free from excessive force and were therefore liable for his injuries pursuant to 42 USC § 1983.

**Court of Appeals:**  This United States Court of Appeals for the Eleventh Circuit has jurisdiction over this matter pursuant to 28 USC § 1291, as the district court's entry of judgment in favor of defendant, followed by its order denying Plaintiffs' motion for relief from judgment, was a final order that disposed of all of Plaintiff's claims in front of the district court.

**Timeliness:**  Plaintiff timely filed his Notice of Appeal in the district court on September 9, 2024 (ECF No. 276).

## <u>ISSUES PRESENTED FOR REVIEW</u>

I.    Did the District Court err in granting Defendant City of Atlanta's Motion for Judgement as a Matter of Law regarding municipal liability after a well-instructed jury found Atlanta to be liable for $60 million in damages that resulted from that municipality's policies, practices, procedures and/or customs?

II.   Did the District Court err in granting remittitur of the punitive damage award against Defendant Grubbs?

III.  Did the District Court err in denying Plaintiff's Motion for Relief from Judgment relative to his claim that the City of Atlanta was statutorily responsible for his medical bills, which arose at a time when he was in Atlanta's custody?

IV.   Did the District Court err in denying Plaintiff's Motion for Attorney Fees?

## STATEMENT OF THE CASE

### A. Introduction

This cause of action arises out of an unconstitutional use of force toward Plaintiff Jerry Blasingame, an elderly homeless man suspected of panhandling in the City of Atlanta. Defendant Jon Grubbs Tasered Jerry in the back, without warning, while Jerry was standing on top of a hill. The fall down that hill left Jerry with a crushed skull and a broken neck, rendered him a quadriparetic and ultimately caused his death.

As a result of the events described below, Plaintiff brought suit against Grubbs and the City of Atlanta. Plaintiff alleged that the customs, policies and practices of the City of Atlanta were the driving force behind Grubbs's unconstitutional conduct. Following a two-week trial, the jury agreed and returned with a verdict totaling $100 million- $60 million against Atlanta and $40 million against Grubbs (which Grubbs has appealed in Case No. 24-12787). However, following trial, the District Court entered judgment in favor of the City of Atlanta, voiding that portion of the jury's verdict. Then, the Court reduced the punitive damage award entered against Defendant Grubbs. The evidence presented at trial fully supported the jury's verdict. The District Court erred in concluding otherwise and must be reversed.

## B. The Underlying Use of Force

On the afternoon of July 10, 2018, Defendant Jon Grubbs and Keith Shelley were on patrol in the course of their employment with the Atlanta Police Department. Shelley was driving the cruiser and Grubbs was the passenger. The two were in the area of Atlanta where I-20, I-75 and I-85 converge. Traffic was generally heavy, or stop and go. As Officer Shelley testified, the two were not responding to any calls at the time. Instead, while in the process of parking their cruiser in a gore area of the highway, they observed Mr. Blasingame. (Tr, pp 827-828.) The area in question is known to have a large homeless population (Tr, p 912). Grubbs and Shelley testified to regularly seeing the homeless and panhandlers in the general area (Tr, pp 828-829, 912). The record established that at the time of these events, Mr. Blasingame was a homeless man who was 65 years old.

Mr. Blasingame was standing on the shoulder adjacent to the left-hand lane of the highway (Tr, p 888-889). Grubbs testified that he never saw Mr. Blasingame on the roadway, never saw him approach any vehicle, interfere with traffic in any way or receive any money from any motorist (Tr, p 1046) Nonetheless, Grubbs testified that he did not know if Mr. Blasingame was panhandling and decided to approach him to question him (Tr, p 1048). He was not planning on arresting Mr. Blasingame (Tr, p 1049).

When Grubbs exited the police cruiser, he had to walk across lanes of traffic

4

in order to get to where Mr. Blasingame was standing (Tr, p 1048).  As Grubbs walked toward Mr. Blasingame, he claims Mr. Blasingame began to run west (Tr, p 1048).  As Mr. Blasingame was running, he never entered the roadway (Tr, p 1050).  Instead, he was running along the shoulder of the road.  On one side of Mr. Blasingame was the yellow line at the edge of the highway; on the other side was a metal guardrail.

As he was running, Mr. Blasingame approached the metal guardrail.  In contrast to Mr. Blasingame, Grubbs was 29 years old at the time, was a trained officer, a former high school track star who specialized in sprinting and he continues to regularly work out (Tr, p 904).  Though Grubbs testified that Mr. Blasingame was able to make it over that guardrail "very quickly," by the time that happened Grubbs had closed to within one foot of Mr. Blasingame.  He stated that he was close enough that he could have touched him had he reached out.  (Tr, pp 1053-1055, 1058.)

According to Grubbs, as Mr. Blasingame made it over the guardrail he swiped his arm back toward Grubbs, never making contact (Tr, p 1056).  Grubbs testified that during the entire course of the events described here, Mr. Blasingame was not armed, did not act aggressively or threateningly and never said a word (Tr, pp 1065, 1069-1070)  He stated that he was not in fear of Mr. Blasingame.  Nonetheless, as Mr. Blasingame made it over the guardrail, Grubbs drew his Taser (Tr, p 1062).  By this point in the events, Officer Shelley had lost sight of the two men and did not see

what occurred (Tr, p 849).

When Mr. Blasingame crossed the guardrail, he entered a path that was in an area overgrown with shrubs, trees and other vegetation (Tr, p 1056).  Importantly, there was a decline on the path that led downhill (Tr, p 536).  Grubbs's testimony at trial left no doubt that he understood the nature of the terrain that Mr. Blasingame was now on:

> **Q.** You knew as you deployed, of course, that you were on an elevated surface; correct?
>
> **A.** Yes.
>
> **Q.** You knew he was running away from you; correct?
>
> **A.** Yes.
>
> **Q.** So and running downhill; right?
>
> **A.** Yes. (Tr, p 1074)

According to Grubbs, without crossing over the guardrail, he deployed his taser and the probes successfully entered Mr. Blasingame's back (Tr, pp 1071-1072). In contrast, Plaintiff introduced testimony from a police procedures expert who each testified that Grubbs *did* cross over that guardrail and proceed down a portion of the path before he fired his taser (Tr, pp 520-521).  While Grubbs made it clear that Mr. Blasingame never posed a threat to him, he testified that he feared that Mr. Blasingame would run into traffic on an adjacent road if he continued to run.  It was that alleged fear that served as the sole basis for the decision to deploy his Taser.

6

Yet, Grubbs acknowledged at trial that he never saw Jerry enter any roadway that day. Further, he acknowledged that there was no evidence Mr. Blasingame ever would have done so:

> **Q.** Officer Grubbs, in this case, you have no evidence that Jerry Blasingame would have run into the roadway, do you? Yes or no?
>
> **A.** No. (Tr, p 1071)

When the 50,000 volts of electricity entered Mr. Blasingame, he lost control of his muscles and fell forward. Because he was on elevated ground, he fell down the hill, which had a concrete platform supporting a traffic control box at the bottom (Tr, p 538-539). He struck his head on that concrete platform, suffering fractures throughout his face and skull. The left side of his skull was crushed and pushed in toward his brain, causing a traumatic brain injury. (Tr, pp 1274-1277). The force also caused his neck to break in the area of his C3-C5 vertebrae (Tr, p 1280). Mr. Blasingame was rendered a quadriparetic who, apart from certain minimal movements and spasms, was entirely paralyzed below the neck until the time of his death years later (Tr, p 1344).

The evidence at trial proved that Grubbs violated numerous policies and aspects of his training relative to the deployment of his Taser. Grubbs admitted at trial that he was trained to yell "Taser! Taser! Taser!" at a subject before firing his Taser. That warning is designed to provide a subject with an opportunity to comply or surrender before the Taser is used. Grubbs gave no such warning here. (Tr, p

7

1067.)  Grubbs was trained to not use his Taser on the elderly or frail absent exigent circumstances.  He was trained not to use his Taser on subjects who were running or who were on elevated ground. (Tr, pp 361, 365, 873-874.)

Michael Banja is a senior officer with the Atlanta Police Department and a certified Taser trainer since 2012 (Tr, p 308).  Banja explained that when a Taser is deployed, it delivers a charge of electricity for five seconds (Tr, p 335).  That charge causes neuromuscular incapacitation that causes an uncontrolled fall where the subject does not have an ability to brace or protect themselves.  Consequently, a Taser can still be considered a deadly weapon (Tr, p 621).  Banja testified that the Department's Standard Operating Procedures provide that officers "shall not" use their Tasers on subjects that are actively running from officers, nor on the elderly or physically frail (Tr, p 384).

Atlanta's Standard Operating Procedures similarly provide that "Environmental factors which could lead to serious injury or death shall be taken into considerations" when deploying a Taser. (Tr, p 380)  Officers are trained to consider the landing zone of subjects before using a Taser:

> **Q.** So in other words, you teach your officers like Officer Grubbs that folks can be seriously injured, or even die, depending on how they fall and, more importantly, how they land?
>
> **A.** Yes.

**Q.** I take it you teach them to be cognizant of, again, where someone is going to fall?

**A.** When practical, we teach to be cognizant of where someone is going to fall. (Tr, p 370)

Grubbs admitted that he was trained to predict landing zones and anticipate where someone may fall before using his Taser, and that you do not want a subject falling in a landing zone you cannot see (Tr, p 927-928). Yet, he testified that he knew Mr. Blasingame was running downhill, he could not see what was at the bottom of that decline and was thus unaware of the metal box on which Mr. Blasingame landed (Tr, p 1089).

Plaintiff's two police procedures experts, Dr. Andrew Scott and Thomas Tiderington, also each testified regarding the use of force. As Mr. Tiderington opined, Grubbs did not have probable cause to arrest Mr. Blasingame (Tr, p 1125). Thus, when Mr. Blasingame began to run, Grubbs did not have justification to utilize his Taser as Mr. Blasingame was within his right to leave (Tr, pp 1126-1127). Dr. Scott agreed (Tr, p 459). Each expert explained that Grubbs violated numerous policies when tasing Mr. Blasingame while he was elderly, running, on elevated ground and where Grubbs did not have knowledge of the landing zone (Tr, pp 516-517, 1147-1148). They left no doubt that the force used in this case amounted to deadly force that was constitutionally prohibited (Tr, pp 622, 1147-1148).

The injuries to Mr. Blasingame were catastrophic. He was taken to Grady Hospital in Atlanta. While at Grady, he was considered to be in detention and in the custody of the City of Atlanta. Grubbs testified that Mr. Blasingame was in custody the moment that the taser prongs entered his back (Tr, p 1079-1080). Atlanta further demonstrated that Mr. Blasingame was in custody by serving him with two different citations while he was in Grady Hospital, which stated that Mr. Blasingame was currently located in "Grady Detention." (Tr, p 558).

Mr. Blasingame subsequently resided in a residential facility known as Safehaven in Georgia (Tr, p 1294). He suffered from quadriparesis and had very little movement below his neck. He had a tracheotomy tube in his neck to enable him to breathe (Tr, p 1205), a feeding tube inserted through his abdomen to enable him to eat (Tr, p 1207), a catheter that passed through his abdomen into his bladder (Tr, p 1209), and he was required to wear diapers (Tr, p 1211). Testimony overwhelmingly established that he continued to feel pain each and every day and that his conditions were very unlikely to improve in any meaningful way (Tr, pp 1233-1234). Unrebutted testimony established that Mr. Blasingame had incurred roughly $4.2 million in medical expenses thus far with a projection of an additional $16,861,652 in future medical expenses (Tr, pp 1425, 1433).

10

### C. The Significance of the Body Worn Camera Policy Violations

Just as Grubbs did not comply with his training relative to the use of his Taser, he also violated policy and training relative to his body worn camera. The camera Grubbs wore had a toggle switch that controlled whether the camera was powered on. When toggled off, it was not functional. When toggled to the on position, it would operate in " buffering mode." While in buffering mode, the camera records constantly. However, it records over the previously recorded footage every two minutes. (Tr, pp 172-176.)

The camera also features what is known as an event button, which is a separate button that gets pressed instead of toggled. When a camera is on and in buffering mode, pressing the event button twice activates recording mode. Then, the footage records until the event button is pressed again and does not record over the footage that had been recorded in buffer mode. By pressing the event button twice, the two minutes of footage that had been recorded in buffer mode is maintained and forms the beginning of the available video footage. Lastly, and of much importance, if an officer's camera is in buffering mode and then the camera is toggled off, the footage that had been recorded in buffer mode is deleted. (Tr, pp 175-179.) Numerous employees of the Atlanta Police Department testified that Grubbs was trained that toggling his camera to the off position would delete the footage that was stored in

buffering mode.  Grubbs and Shelley each testified that they never received any such training.  (Tr, pp 822, 915.)

Atlanta police officers are required to keep their cameras toggled on and in buffering mode at all times.  When an officer begins to interact with a member of the public or anticipates an interaction, they must the event button twice to begin recording.  When that event ends, they may hit the event button again and return to buffer mode.  It appears that there are no scenarios in which officers may turn their cameras off.  (Tr, pp 187, 189.)

Initially, Officer Grubbs claimed that he went to the bathroom at the beginning of his shift and that he toggled his camera off at that time.  He claimed that he did not remember to turn his camera back on and that it therefore was off at the time of the encounter with Mr. Blasingame.  The record conclusively shows otherwise.

Plaintiff introduced into evidence an audit trail of Grubbs's body cam, which documented how Grubbs used his camera that day.  Julio Reyes, Jr. has worked in the Atlanta Police Department for over 24 years and trains the department's officers on how to use their cameras (Tr, pp 146-147).  He was designated as the person most knowledgeable regarding the body worn camera program (Tr, 156).  Examining that audit trail, he testified that Grubbs turned his camera off toward the beginning of his shift.  (Tr, pp 238, 244-245).  However, contrary to what Grubbs claimed, he turned his camera back on at 12:40 p.m.  (Tr, p 248.)  Grubbs's camera was on and in

12

buffering mode when he saw Mr. Blasingame. However, at 2:36 p.m., Grubbs toggled his camera *off*. (Tr, p 252.) It was not turned back on until after Mr. Blasingame was face down at the base of the hill with a broken neck and a crushed skull. Reyes agreed that it was not a close call that Grubbs violated Atlanta's policies and his training when he toggled his camera off (Tr, p 181). When asked whether a violation of the body camera policies was a minor matter, he stated:

> No. All of the policies are -- are important. They're there for a purpose, and they have to be followed accordingly. My approach as a trainer is, there is no one policy that is more important than another. They're all important. And they're all of our responsibility to make sure that we're knowledgeable of them and follow them. And that's what we're responsible [sic] for when we sign off on the policies. [Tr, p 160].

Plaintiff's police procedures expert, Dr. Andrew Scott, testified that the encounter with Mr. Blasingame began at roughly 2:36 p.m. He explained that the entirety of the encounter, from when Grubbs began to approach Mr. Blasingame until the time he used his Taser on him, took less than two minutes. Grubbs has his camera on and in buffer mode at the beginning of the encounter. *After* Grubbs used his Taser on Mr. Blasingame, he toggled his camera off, which destroyed the footage of the encounter that was stored. (Tr, pp 468-471.) Had Grubbs hit the event button instead, as policy required, that footage would have been maintained.

Multiple witnesses in this case (including Grubbs (TR, p 1076) and Reyes (Tr, p 164)) agreed that the evidence captured by the camera would have been the best evidence in this case, had it not been destroyed. When asked if that evidence would

have been the best evidence of what occurred, Dr. Scott responded "Without a doubt. That's why Atlanta Police Department and so many other agencies in the United States are using body-worn cameras, because they reflect an unbiased opinion, so to speak, of what transpired." (Tr, p 471)

When considering the circumstances of this case- where Grubbs used his Taser on an elderly homeless man's back without warning while that man was at the top of a hill and running- it calls to question whether Grubbs intentionally covered up his misconduct.  Reyes testified that it was possible that Grubbs intentionally turned off the camera to delete evidence (Tr, p 181).  Had he been in charge of this investigation, he would have looked into Grubbs's past use of his body camera to determine whether he had a pattern of turning his camera off, but he was not asked to do that by Atlanta (Tr, p 164).  He agreed that if Grubbs intentionally destroyed this evidence, it was potentially a criminal act and that if Atlanta truly wanted to ascertain the truth of Grubbs's account, that evidence should have been looked into. (Tr, pp 183-184.)

Plaintiff's police procedures experts both agreed with Reyes regarding the significance of Grubbs's destruction of evidence (Defendants offered no expert testimony in this case, leaving this evidence unrebutted).  Dr. Scott testified that "the camera should have never been turned off. That -- it leads me to believe that Officer Grubbs intentionally turned the camera off and subsequently erased the buffering,

14

which would have captured the initial contact with Mr. Blasingame and the subsequent foot pursuit and tasing." (Tr, p 581) Thomas Tiderington testified that

> My conclusion was that the camera was intentionally turned off to erase the event that occurred on this particular day, and then it was turned back on. And, in fact, it happened twice. It happened during the initial encounter with Mr. Blasingame, and then it happened a second time right after Mr. Grubbs asked to use his partner, Officer Shelley's cell phone to make a phone call to his supervisor, he turned the camera off a second time, in my opinion, intentionally turned the camera off a second time. [Tr, p 1118]

Dr. Scott and Mr. Tiderington each explained the importance of complying with body camera policies. The City of Atlanta performed a department wide audit on body cam usage from November 2017 until May 2018. It issued a report on that audit in December 2018. (Tr, p 266.) That Report addressed officers' compliance with body cam policies up until two months prior to the events of this case (Tr, pp 267-268). When asked about the audit results, Reyes testified as follows:

> **A.** I can't recall an actual percentage number, but I do recall that the audit findings, their data reported that usage as far as how activation, when the officers are supposed to start their recordings was lower than acceptable.

***

> **Q.** Thank you. In that first paragraph, officers assigned body-worn cameras captured video for 33 percent of officer dispatch calls occurring from November 27 -- excuse me, November 2017 through May 2018. Did I read that right?

> **A.** Yes, sir.

15

**Q.** Police department staff told us they would expect 80 percent of all incidents to have corresponding video. Did I read that right?

**A.** Yes, sir.

**Q.** So 33 percent, folks were using it; is that right?

**A.** Yes, sir.

**Q.** Which means 67 percent of folks, officers, did not?

**A.** Yes, sir. (Tr, pp 269-270)

Reyes agreed that 2/3 of officers not following department policy shows a pattern (Tr, p 276). He agreed there is a practice of not following department policy regarding body cameras (Tr, p 276). He agreed there was a custom of officers not using the event button properly and said he was not aware of them being disciplined (Tr, pp 290-291).

Plaintiffs' experts made the significance of the customary body camera policy violations clear. Dr. Scott stated that "I believe that there may be a culture within the organization that intentionally overlooks or dismisses some of the most obvious and blatant policy violations, and as a result, ignore it." (Tr, p 584). When asked if that failure to investigate was an innocent oversight, Dr. Scott said that it couldn't be and that "I think there is a pattern and practice within the agency that allows this to occur." (Tr, p 585). Then, the following exchange occurred:

**Q.** Do you have an opinion as to whether that indifference of a pattern and practice directly led to this very event?

16

**A.** Yes.

**Q.** What is your opinion on that?

**A.** Yes. That indifference led to this type of behavior, and further leads to additional types of behavior similarly, because no one's held accountable and management is not doing what they need to do to hold people accountable.

**Q.** How can, in your estimation, this indifference, in pattern and practice, have led to this event, sir?

**A.** Well, a pattern and practice or indifference is generated over a myriad of years. It becomes part of the agency culture not to hold its members accountable and not fully investigating cases of this nature. And then what happens with that is, it compromises the trustworthiness of the police department to the public. And it occurs over many, many years, and it becomes just a custom. [Tr, p 586]

When asked how a failure to enforce body worn camera policies relates to use of

force, Dr. Scott testified

> So if you're not holding your officers accountable, particularly on the most highest duty that an officer is allowed to perform, meaning use of force, then the officers, not only just the officer that is in question, but the officers throughout the rank and file, recognize that there is no consequence to their actions. So if there is no consequences and they're not being held accountable, that means then officers can go off the rail and do what they think they should do when it's not comporting or complying with the agency's policy. It's a very bad formula for disaster to the general public of not adequately keeping your officers accountable for their actions. (Tr, pp 587-588)

Mr. Tiderington, who has 44 years of law enforcement experience, including

20 years as a chief of police, opined that there was a direct connection between

enforcement of body worn camera policies and use of force.

17

**A.** There is an absolute connection between the body-worn cameras and the use of force by police officers, in my opinion.

**Q.** How?

**A.** It's my experience -- well, first of all, we have to kind of explain what the purpose is of the body-worn cameras, and the purpose of the body-worn cameras is to -- one of the main purposes is to exonerate our police officers who are being accused of misconduct. So oftentimes commanders, police chiefs, we want to view the video to prove that our officer acted properly. And to exonerate any type of false allegation made against our officers. It's my experience that many, many good officers want every second of the event captured on video so they can prove what they did was -- was proper. So they go out of their way to make sure that the camera is actually videotaping properly, videotaping the events that are occurring there.

**Q.** Okay. And how is that then connected, the camera itself and use of force, Mr. Tiderington?

**A.** As far as how it is connected to the use of force, it's been my experience that the -- once we deploy body-worn cameras at least in my departments and other departments that I'm familiar with, it has reduced the number of citizen complaints made against our officers, and it also has reduced the incidents of use of force that departments experience prior to deploying the cameras. [Tr, pp 1118-1119.]

Then, similarly,

**Q.** Does the use of on-body cameras, if utilized appropriately, can it prevent, if you will, excessive force?

**A.** I believe they do prevent excessive force. (Tr, p 1120)

Mr. Tiderington explained that it was

very disappointing to see the non-compliance on behalf of a large number of officers within the police department that failed to utilize the cameras appropriately. I think the number was somewhere, somewhere -- to me it was shocking of all of the events captured, only -- of all of

18

the events that occurred, only 60 -- I'm sorry, 30 to 40 percent of the incidents were captured on video, which means 70 percent of the time the officers were not properly, according to policy, utilizing the tools that were provided to them by the City of Atlanta at a great expense to the City of Atlanta. (Tr, p 1122)

### D. Procedural History

The trial in this matter began on August 17, 2022, and concluded on August 26, 2022.  At the close of trial, the jury returned with a verdict totaling $100 million in Plaintiff's favor- $60 million as to Atlanta and $40 million to Grubbs (ECF No. 163).  Both Defendants brought motions for judgment as a matter of law (ECF No. 155), which Plaintiff opposed (ECF Nos. 168 and 169).

On September 14, 2022, the District Court issued its order denying the motion for JMOL by Grubbs, but granting the motion on behalf of Atlanta.  The Court directed the clerk to enter judgment in favor of Atlanta and judgment against Grubbs for the amount reflected in the jury verdict.  (ECF No. 177).  The Court held that the evidence presented at trial did not satisfy the applicable requirements for a claim of municipal liability.

On October 6, 2022, Plaintiff brought a Motion for Attorney Fees as the prevailing party (ECF No. 186). Further, Plaintiff filed his motion for relief from order on October 12, 2022, in which Plaintiff asserted that the jury's verdict relative to municipal liability was consistent with the law and the evidence presented at trial (ECF No. 187).  On October 20, 2022, Plaintiff filed his motion for relief from order

in which he asserted that he was statutorily entitled to payment of certain medical bills by Atlanta. (ECF No. 191). Those motions were denied (ECF No. 219). Thereafter, on April 27, 2023, Plaintiff timely filed his notice of appeal (ECF No. 226).

While on appeal, this Court dismissed the appeals of all parties for lack of jurisdiction, finding that there had not yet been a final order entered by this Court. The Court concluded that the stipulated dismissal of Count II of the First Amended Complaint prior to trial (which was a count under state law. See ECF No. 147) was ineffective. Specifically, the Court stated that it "do[es] not have jurisdiction over this appeal" because Rule 41 'provides only for the dismissal of an entire action,' not a single claim." See ECF No. 251 at 4 (citing *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1143 (11th Cir. 2023). In *Rosell*, the Eleventh Circuit explained that while Fed. R. Civ. P. 41 could not be used to dismiss anything less than an entire action, there were other available mechanisms by which individual counts could be dismissed. The Court stated that "[l]itigants who wish to dismiss, settle, or otherwise resolve less than an entire action can ensure that they receive a final judgment on the remainder of their claims—which means that we have appellate jurisdiction—by seeking partial final judgment under Rule 54(b) from the district court, or by amending their complaints under Rule 15." *Rosell*, 67 F.4th at 1144.

Following remand, Plaintiff filed his unopposed motion to amend his

complaint, consistent with *Rosell* (ECF No. 256).  The court granted that motion and stated that "The Court previously filed a judgment on September 22, 2022. Doc. No. [179]. This judgment and all orders entered following that judgment shall remain in full force and effect unless and until otherwise ordered by the Court." (ECF No. 260).  Nonetheless, in that same order, the Court invited Defendant to file new post judgment motions- the same motions that the Court had previously denied when Defendant Grubbs filed them untimely.

With the Court reopening the window to file post-trial motions and thus saving Grubbs (and counsel) from their prior untimely filing, Grubbs once again sought remittitur (ECF No. 263).  This time, the Court considered the motion to be timely (despite being filed approximately 20 months from the entry of the September 22, 2022 judgment that remained in effect).  The court granted Grubbs's motion for remittitur, holding that the jury's award of $20 million in punitive damages was unconstitutional and reducing that award to $1 million (ECF No. 270).  Plaintiff now appeals as of right.

At the time of this writing, the City of Atlanta is asserting that it will not indemnify Officer Grubbs, despite not disciplining him for this use of force and despite the fact that he is still employed by the Department.  Plaintiff asserted at trial that the City should be obligated to indemnify Grubbs where the same attorneys defended both Grubbs and the City at trial, which the District Court opined was a

conflict of interest because those attorneys were taking positions for the City that were contrary to Grubbs's interest (Tr, p 1020). In other words, with the judgment against the City vacated, Mr. Blasingame faces a future where he will potentially recover nothing despite the jury awarding him $100 million dollars and despite the fact that he incurred millions of dollars in medical bills, immense suffering and death.

## STANDARD OF REVIEW

As this Court has previously stated, "[w]e review *de novo* the district court's rulings on motions under Rule 50 of the Federal Rules of Civil Procedure, examining the trial evidence in the light most favorable to the non-moving party." *Doe v Celebrity Cruises, Inc*, 394 F3d 891, 902 (CA 11, 2004).

## SUMMARY OF ARGUMENT

The District Court erred in granting the City of Atlanta's Motion for Judgment as a Matter of Law. During trial, Defendant's own employees admitted that there was a policy, practice or custom in the department of officers not properly recording events on their body cameras. The City's own audit of its officers showed that in 2/3 of encounters with the public, officers were not recording their interactions. Defendant's own employees then testified that they were unaware of any employees being disciplined for those violations.

Plaintiff introduced the testimony of two highly qualified police procedures

experts who have each served as chiefs of police and each been responsible for internal affairs departments. Both of those experts testified that there was a de facto policy of not enforcing body camera policies in Atlanta and that there was a direct connection between that de facto policy and uses of force. When officers know that they can get away with not recording interactions with the public, or even deleting those interactions after they occur, they are aware that they can eliminate evidence of uses of force without ramification. That is precisely what occurred here, and the precedent of the United States Supreme Court and the Eleventh Circuit each provide for liability under these circumstances.

The Court further erred in granting Grubbs's untimely motion for remitter. Having denied that motion once for being untimely, the Court inexplicably reopened the window for Grubbs to file a new motion for remittitur. Then, contrary to the controlling law on the subject, held the jury's punitive damage award to be unconstitutional.

The District Court also erred in holding that Atlanta was not responsible for Plaintiffs medical bills pursuant to O.C.G.A. § 42-5-2. Pursuant to that authority, Defendant is obligated to pay for the medical care of individuals who are in Defendant's custody. At the moment Grubbs tased Mr. Blasingame, Mr. Blasingame was in custody. He remained in custody when he was taken to Grandy Hospital, which is utilized for those in detention or custody.

23

Finally, the District Court erred in denying Plaintiff's motion for attorney fees. The District Court did not deny that motion for substantive reasons, as it determined that Plaintiff was the prevailing party.  However, the Court stated that it was deferring its final ruling on attorney fees until after the appeals in this matter were complete and noting that Plaintiff would have a right to renew that motion at a later time.  Because that order was not entered separately from the order from which Plaintiff now appeals, Plaintiff maintains his entitlement to the claimed fees in order to properly preserve that claim.

## **ARGUMENT**

## I.    **The District Court erred in granting Defendant's Motion for Judgment as a Matter of Law relating to municipal liability**

The question before this Court relates to the propriety of municipal liability pursuant to 42 U.S.C. 1983.  In *Monell*, the United States Supreme Court determined that, contrary to its prior decision in *Monroe v. Pape*, 365 U.S. 167 (1961), local governments are properly classified as "persons" under 42 U.S.C. 1983 and thus are amenable to suit under that legislation.  In explaining when such suits are proper, the Court stated as follows.

Addressing why a municipality could be held liable for its customs and not just its officially adopted policies, the Court quoted Justice Harlan's words in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-168 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread

24

discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

Eleven years after *Monell* was decided, the Supreme Court had further opportunity to explain the contours of municipal liability.  In *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Supreme Court described the issue it faced thusly: "In this case, we are asked to determine if a municipality can ever be liable under 42 U. S. C. § 1983 for constitutional violations resulting from its failure to train municipal employees. We hold that, under certain circumstances, such liability is permitted by the statute."  As will be shown below, the present case falls squarely within the holding in *City of Canton*

In *City of Canton*, the Plaintiff was arrested and brought to the Canton Police Department via a patrol wagon.  When officers arrived at the station, they discovered that the Plaintiff was sitting on the floor of the wagon and was seemingly incoherent. After taking her into the station, she "slumped to the floor on two occasions." Officers never sought medical attention for the Plaintiff, who was released from custody after approximately one hour. Thereafter, her family had her transported to the hospital where she was diagnosed with emotional conditions that resulted in a week's hospitalization and a year of outpatient treatment.  *Id*. at 381.

The Plaintiff brought suit and alleged that the municipality was liable for the

failure to provide her with necessary medical care, asserting that the municipality had a policy by which the shift commanders in the station had exclusive authority to decide whether a prisoner required medical care and that because those shift commanders did not have inadequate training, unconstitutional deprivation of medical care necessarily resulted.  *Id*. at 382.

In affirming that the municipal defendant could be held liable, the Supreme Court explained several crucial points.  First, in recognizing the viability of a "failure to train" theory, the Court stated that "[f]or reasons explained below, we conclude, as have all the Courts of Appeals that have addressed this issue, there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983. Thus, we reject petitioner's [the City of Canton] contention that only unconstitutional policies are actionable under the statute."  *Id*. at 387.  Consequently, Plaintiff need not show that the City of Atlanta had any policy that was, itself, unconstitutional. Plaintiff only needed to show that a policy or custom was the driving force of the unconstitutional act committed by Grubbs.

Next, the Court explained that where a Plaintiff proceeds on a theory of failure to train, he must demonstrate that the failure to train was motivated by deliberate or conscious indifference of the municipal defendant.  The Court stated that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure

26

under § 1983." *Id*. at 389. "To establish a city's deliberate indifference, 'a plaintiff must present some evidence [such as the audit evidence and testimony in this case] that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" *Lewis v City of West Palm Beach*, 561 F.3d 1288, 1293 (quoting *Gold*, 151 F.3d at 1351-52).

After explaining a municipality can be held liable for its deliberate failure to train employees, the Court turned to the type of causal connection that had to be shown for liability to attach. The Court noted "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id*. at 391. Thus, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id*. at 391. The Supreme Court also made it clear that the causal determination is generally a question of fact:

> Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task. [*Id*. at 391.]

*City of Canton* demonstrates that if a jury finds that a municipality's 1.) failure

to train is 2.) the product of deliberate indifference and 3.) is closely related to the ultimate injury caused by a constitutional violation, municipal liability under 42 U.S.C. 1983 is appropriate.

The 11th Circuit has acknowledged that "[t]he Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v City of Miami*, 151 F3d 1346, 1350 (11th Cir., 1998).

In holding that Defendants were entitled to JMOL, the Court stated that "while Plaintiff's experts gave broad, conclusory opinions that proper use of BWCs can reduce uses of excessive force, Plaintiff did not show that the APD's failings regarding BWC usage increased uses of excessive force. Thus, even if Plaintiff showed a persistent failure to comply with or enforce the APD's BWC policies, that failure was not shown to have resulted in a widespread use of excessive force." The Court then referenced one of the two jury instructions provided before jury deliberations, which discussed the need to show at least one prior, similar use of unconstitutional force. The Court stated that "[a]t the very least, the jury's verdict was not supported by evidence concerning" a prior constitutional violation.

The jury was provided with two different instructions regarding municipal liability. The order granting Defendant's motion focused on the second of those two

instructions, which relates to a failure to train theory of liability. But, the Court's order does not reflect that it likewise considered the first instruction, which provided:

> City of Atlanta is not liable for violating Jerry Blasingame's constitutional rights simply because it employed Defendant Officer Grubbs. Rather, City of Atlanta is liable if Plaintiff proves that an official policy or custom of City of Atlanta directly caused his injuries. Put another way, City of Atlanta is liable if its official policy or custom was the moving force behind Jerry Blasingame's injuries.
>
> An "official policy or custom" means:
>
> 1.  A rule or regulation created, adopted or ratified by the City of Atlanta; or
>
> 2.  A policy statement or decision made by the City of Atlanta's policymaker; or
>
> 3.  A practice or course of conduct that is so widespread that it has acquired the force of law- even if the practice has not been formally approved.

As the Court acknowledged, Plaintiff presented evidence of an official policy or custom and evidence that said official policy or custom was the driving force behind the unconstitutional use of force in this case. Nothing more was required, including any showing regarding a history of constitutional violations.

The Eleventh Circuit has stated that "[w]e have noted that a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'" *Vineyard v. Co of Murray*, 990 F.2d 1207, 1212 (11th Cir., 1993). That recognition was a necessity, as the United States Supreme Court has stated that "'in

29

a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v Thompson*, 563 U.S. 51, 63 (2011).

In granting Defendants' renewed motion, the Court expressed concern that Plaintiff only produced one opinion in which a court accepted the theory that a failure to enforce BWC policies could be a moving force behind an unconstitutional use of force. There is no obligation to show other actions that have prevailed on a similar theory. Plaintiff was obligated to show that a custom or policy by *this* municipal defendant was the moving force behind *this* constitutional violation. If Plaintiff merely offered unsupported arguments to the jury that asked them to conclude that there was a causal link in this case, the novelty of the theory would be a relevant consideration for the Court. Instead, this Plaintiff offered unrebutted expert testimony explaining exactly how the City's admitted failings inevitably led to this specific constitutional violation.

While neither *Monell* nor its progeny require a similar theory of municipal liability to have been previously advanced elsewhere, the increased availability of BWCs is resulting in courts acknowledging the sound logic of the theory in this case. In *Epps v City of Denver*, 2022 U.S. Dist. LEXIS 35895 (March 1, 2022), the Court denied a motion for summary judgment on a municipal liability claim where Plaintiff's experts opined in their reports that a preexisting policy of not enforcing

30

body camera usage was a driving force of a subsequent use of excessive force.  The Court explained that "Defendants misunderstand the application of plaintiffs' evidence. Plaintiffs argue that Denver's failure to require use of force reports and body worn camera activation, a preexisting policy understood by officers before the protests, notified officers that they likely would not be held accountable for excessive uses of force and thus caused them to use excessive force. Plaintiffs have presented sufficient evidence to support this causal claim."

Similarly, the District Court in *Jones v Louisville/Jefferson County Metro Gov't*, 482 F.Supp.3d 584 (2020) also recognized the sound logic behind the theory advanced here.  In denying a pre-discovery motion to dismiss, the Court explained that

> Here, it is plausible to infer that un-filmed officers may act differently than those who are under surveillance. True, there will be times when officers with cameras use excessive force, just as there will be times when officers without body cameras do not use excessive force. But it's plausible to infer that a city-wide decrease in body camera usage will result in a city-wide increase, to some degree, in incidents of excessive force. This claim is bolstered by the pleaded fact, which this Court must accept as true, that officers confiscated and destroyed Plaintiffs' surveillance footage of the raid in question.

The Court then stated that "the plaintiffs may lose on this *Monell* claim — on custom, on causation, or on both. But at the motion to dismiss stage, Plaintiffs have plausibly pleaded that Louisville Metro has a custom of not having officers wear or activate body cameras and that this custom caused their injuries. This claim may

proceed." Since that time, numerous district courts in the nation have likewise recognized the viability of such a theory, including in the Northern District of Georgia. See *Farr v CTG Hospitality Group, LLC*, ___F Supp 3d___; 2024 U.S. Dist. LEXIS 43854 (ND Ga, Mar. 13, 2024); *Rose v Baltimore Co*, ___F Supp 3d___; 2024 U.S. Dist. LEXIS 151257 (D Md, Aug. 23, 2024); *Cruz v City & Co of Denver*, ___F Supp 3d___; 2023 U.S. Dist. LEXIS 224953 (D Colo, Dec. 18, 2023)

While the Court may have considered Plaintiff's municipal liability theory to be novel, other district courts have acknowledged that if the evidence shows that a lack of enforcement of BWC policies was the moving force behind a use of excessive force, liability is proper. *Jones* is of even greater relevance because it notes that the theory was buttressed by the allegation that officers, in addition to not using their cameras, destroyed what footage did exist. The same is true here. When considering the other inaccuracies and inconsistencies within Grubbs's account, there was every reason to believe that this is an officer who is enabled by the City's dereliction in enforcing the policies it enacted to protect the public, which is exactly what Plaintiff's experts opined.

While the Plaintiffs in *Epps* and *Jones* were not at the trial stage when the opinions were issued, those Courts recognized that if the proofs substantiated the allegations, municipal liability would be proper. Whether any other Plaintiff has successfully made that showing at trial is irrelevant. This Plaintiff, in this trial, *did*.

Defendant did nothing to rebut the overwhelming evidence presented to the jury. The only aspect of Plaintiff's claim that appears to be disputed is whether there was a causal connection between the custom and the underlying violation. Defendants' own 30(b)(6) witness, Reyes, testified that there was a custom of not enforcing bodycam policies. The City is bound by that admission. And the audit report leaves no question that the City was aware of the failure to abide by the BWC policies and did nothing to remedy those failures.

All that was left in light of the overwhelming evidence of custom or policy was causation. Plaintiff undoubtedly produced expert testimony regarding that element. Dr. Scott, who is a Doctor of Criminal Justice with more than 30 years of law enforcement experience that includes being a chief of police and a head of internal affairs, testified that the audit demonstrates a pattern, practice and custom of not training and supervising officers' use of their body cameras and that the City's failure in those regards resulted from deliberate indifference. He explained that in such an environment, officers knew that there were no consequences in failing to comply with the policy. He testified that the City's failure to train and supervise relative to body cameras directly led to the use of force here.

Similarly, Chief Tiderington, is a highly experienced and qualified expert with more than 40 years of law enforcement experience who testified that the audit evidence demonstrates that the City has a de facto policy of not supervising and

33

training its officers on proper body cam use.  He explained that where such a policy exists, the consequence is an increased likelihood that officers will use excessive and unconstitutional force.  He stated that where a municipality freely permits officers to not abide by body camera policy, that municipality is training the officers to use whatever level of force they desire.  He also testified that in Departments where body cameras are instituted and utilized, uses of force decrease.

The District Court's conclusion that Plaintiff did not adequately make a connection between the custom/policy and the use of excessive force amounts to an improper determination that Plaintiff's unrebutted witnesses were not credible. "When the resolution of the case boils down to credibility, the trial judge must allow the jury to function." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558 (11th Cir. 1984).  Dr. Scott and Chief Tiderington each have exceptional amounts of experience with supervising officers.  If they unambiguously stated that there was a causal connection between this specific custom and this specific use of force, this jury was permitted to deem their testimony credible and reach the verdict it did.

## II.    The District Court improperly granted Defendant's request for remittitur relative to the punitive damage award

Just as the District Court improperly eliminated $60 million in compensatory damages that the jury properly attributed to the City of Atlanta on the municipal liability theory, so too did it improperly grant remittitur to Defendant Grubbs on the award of punitive damages.

### A. Defendant's motion was untimely

To begin, the District Court procedurally erred in considering Defendant's motion, which it had previously denied as being untimely prior to remand.  On December 23, 2022, three months after the judgment was entered, Grubbs filed a motion for relief from judgment, which he stated was pursuant to Fed. R. Civ. P. 60.  In that motion, Grubbs sought remittitur and asserted that the jury's verdict was both excessive and unconstitutional.  (ECF No. 207.)

Plaintiff responded to Defendant's motion and explained that a motion seeking remittitur is properly brought pursuant to Fed. R. Civ. P. 50 or 59, depending on the precise nature of the argument.  Each of those rules requires the motion to be filed within 28 days of the judgment.  Plaintiff argued that Defendant improperly labeled his motion as a Rule 60 motion in order to try to avoid the clear time limits that Defendant had missed.  Plaintiff similarly argued that because Defendant had already filed his notice of appeal, the District Court was divested of jurisdiction and was not permitted to substantively alter the judgment, as Defendant requested.  The District Court denied Defendant's motion on the basis of the two procedural arguments described above.  The Court correctly found that Defendant's motion was properly seen as a motion pursuant to Fed. R. Civ. P. 59(e), that such a motion had to be filed within 28 days of the entry of judgment and that Defendant failed to meet that deadline.  (ECF No. 219.)

35

Defendant's motion prior to remand contended that the award of punitive damages was excessive and unconstitutional and is thus subject to remittitur. In other words, Defendant was asking the District Court to amend the judgment it entered on September 22, 2022, in order to reduce the amount of the punitive damages the jury awarded Plaintiff. Fed. R. Civ. P. 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Thus, Defendant had until October 20, 2022, to timely file his motion. The motion was not filed until December 23, 2022, which was more than two months after the applicable deadline.

Similarly, the 11th Circuit has held that Fed. R. Civ. P. 50 applies when there is an argument that a judgment must be reduced to comply with constitutional limits. *Johansen v. Combustion Eng'g, Inc*, 170 F.3d 1320, 1331 (11th Cir., 1999). Fed. R. Civ. P. 50(b) likewise provides that any post-trial motion under that rule must be filed within 28 days of the judgment.

All of the arguments contained in Defendant's motion were controlled by either Rule 50 or Rule 59 and each of those rules imposes a 28-day deadline on the moving party. Defendant's motion was due no later than October 20, 2022, and was unquestionably untimely by more than two months.

The question of remittitur should have ended with the Court's ruling that Defendant's motion was untimely. However, after this Court remanded back to the

District Court to properly secure the dismissal of the state law count, that Court

improperly permitted Grubbs to refile the motion that had previously been denied.

In the Court's view, because it had to enter a new judgment, the window for filing

post-trial motions was reopened.  First, no new judgment was necessary.  All this

Court r

In *Johnston v Borders*, 2019 U.S. Dist. LEXIS 228218, a district court case from

the Middle District of Florida, the court cited approvingly to *McNabola v Chicago*

*Transit Auth.*, 10 F.3d 501 (7th Cir. 1993):

> In *McNabola v. Chicago Transit Authority*, the Seventh Circuit
> addressed a nearly identical situation. The plaintiff argued that the
> defendant's post-judgment Rule 59 motion, and alternatively, the
> amended judgment, suspended the finality of the original judgment,
> "meaning the court had jurisdiction to consider his [Rule 59 motion]"
> outside the deadline. *McNabola*, 10 F.3d 501, 521 (7th Cir. 1993).
> There, the district court entered an amended judgment (granting the
> defendant's Rule 59 motion) that lowered the plaintiff's damage award
> after he accepted the court-ordered remittitur. Id. at 521. The plaintiff
> then filed his own Rule 59 motion seeking to add prejudgment interest.
> Id.
>
> The Seven Circuit found the plaintiff's Rule 59 motion untimely,
> reasoning that "although a timely post-judgment motion opens up the
> earlier judgment . . . the non-moving party may not then make its own
> untimely request for alteration of the judgment on a wholly independent
> ground." *Id*. at 520 (citation omitted). For an amended judgment to
> constitute a new judgment with a new period for filing Rule 59 motions,
> the second Rule 59 must bear some relationship to the district court's
> alteration of the original judgment. *Id*.; see also *Tru-Art Sign Co. v.*
> *Local 137 Sheet Metal*, 852 F.3d 217, 221 (2d Cir. 2017) ("When both
> an initial judgment and an amended judgment exist, the timeliness of a
> Rule 59(e) motion is determined from the date of the amended
> judgment only if the motion bears some relationship to the district

court's alteration of the first judgment."). **The Seventh Circuit went on to comment that "[t]he time limit would be a joke if parties could continually file new motions, preventing the judgment from becoming final**." Id. at 522.

The rationale above- that a new motion following an amended judgment should only be permitted if it bears some relationship to the alteration of the first judgment- should be applied here. This Court's remand should not have served as a parachute for a Defendant that had failed to file a timely motion for remand following trial. That is particularly true where the need for remand was created by an order that Defendant stipulated to. None of the parties (nor the district court) anticipated that the manner they used to dispose of the state law count would create procedural issues on appeal or interfere with appellate jurisdiction. The motion for remittitur following remand should have never been considered. The error resulted in a $19 million reduction of the judgment that should have remained in effect.

## B. The punitive damage award was not unconstitutional

In addition to improperly considering an untimely request for remittitur, the district court also erred in determining that the award was unconstitutional. At the outset, it must be noted that Defendant's motion was devoid of any reference to the jury instructions provided in this case. "The 'rule' -- indeed, the premise upon which the system of jury trials functions under the American judicial system -- is that juries can be trusted to follow the trial court's instructions." *Parker v Randolph*, 442 U.S. 62, 75 n 7 (1979). This jury was thoroughly instructed regarding the law of damages

38

and there was no argument that those instructions were incorrect, nor was there an effort to show that the jury disregarded those instructions. Instead, Defendant's argument was, at its heart, a mere disagreement with the jury's conclusion.

The district court erred in holding that the punitive damage award was unconstitutional. In assessing punitive damage awards in the face of a constitutional challenge, courts are to analyze three "guideposts": (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v Campbell*, 538 U.S. 408, 418 (2003). Plaintiff will address those guideposts below.

## 1. Defendant's conduct was reprehensible

When assessing the reasonableness of a punitive damages award, the reprehensibility guidepost is the "most important." *State Farm* at 419. Indeed, the reprehensibility of a defendant's conduct is "the most important indicium" of a punitive damages award's reasonableness. *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996); see also *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008).

In making the reprehensibility determination per *State Farm*, courts are instructed to consider the following five factors: 1) the harm caused was physical as

opposed to economic; 2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; 3) the target of the conduct was financially vulnerable; 4) the conduct involved repeated actions or was an isolated incident; and 5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir.2008) (citing *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614-615 (11th Cir. 2000)). "Reprehensibility grows more likely as more factors are present." *Sepulved*a v. Burnside, 432 F. App'x 860, 865 (11th Cir.2011) (*citing State Farm*, supra at 419).

For consideration of the first reprehensibility factor, whether "the harm caused was physical as opposed to economic," *State Farm, Supra* at 419, the Eleventh Circuit held in *Goldsmith*, 513 F.3d at 1283, that psychological harm suffices to support a finding of physical harm. Here, there is no contest as to the severity of Plaintiff's physical injuries and the mental anguish he has suffered as a result. Trial was replete with testimony as to the daily suffering Plaintiff experienced from the time of this tasing and how he will never improve.

The second factor, whether the "tortious conduct evinced an indifference to or reckless disregard of the health or safety of others," *State Farm, Supra* at 419, weighs in Plaintiff's favor. When evaluating this second factor, courts consider "the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460

(1993). Testimony demonstrated that Defendant Grubbs, by disregarding training on the environmental factors that impact the reasonableness of taser usage, was indifferent toward Mr. Blasingame's safety and health.  Further, there is no record evidence of any corrective action; in fact, Defendant continues to dispute that he acted unreasonably despite the overwhelming evidence to the contrary.

Similarly, the third factor in assessing reprehensibility, "whether the target of the conduct had a financial vulnerability," *State Farm, Supra* at 419, weighs in Plaintiff's favor. Mr. Blasingame was a homeless man relegated to relying on the charity of others to survive.

The fourth reprehensibility factor, whether "the conduct involved repeated actions or was an isolated incident," *State Farm, Supra* at 419, also potentially weighs in Plaintiff's favor. Evidence adduced at trial demonstrated that Defendant had been trained on how to use his body camera and that the City of Atlanta had determined that its officers were failing to record interactions with the public, as required by policy. Defendant Grubbs perpetuated that department wide conduct.

The final factor, whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident," *State Farm, Supra* at 419, also favors Plaintiff. Defendant Grubbs' actions were not a "mere accident," *State Farm*, supra at 419 (*citing Gore*, supra at 576—77) as he consciously elected to use the force that he did.  Moreover, he then engaged in deceit and trickery by toggling his body worn

41

camera off and destroying the footage of his conduct. The district court, however, completely ignored those facts, stating that there was no indication in this record that Defendant was acting in bad faith. Again, the jury clearly found differently and the testimony described throughout this brief supported that conclusion. The trial court very evidently substituted its own judgment and credibility determinations for that of the jury that Mr. Blasingame had a constitutional right to have a trial before.

Again, reprehensibility is the most important factor in assessing the reasonableness of this award, and an award is more likely to be affirmed as the reprehensibility factors weighing in Plaintiff's favor increase. Here, each and every factor weighs in Plaintiff's favor. The district court held otherwise, concluding that it did not believe that Grubbs could be considered to have acted in a reprehensible manner. This was a defendant who, despite alleged training on the subject, chased an elderly homeless man who he suspected of no crime and then proceeded to use lethal force on that man without warning. Those are the facts of the case. The district court's ruling entirely deviates from this record and bears no resemblance to what the evidence proved at trial (as is demonstrated by the jury's verdict).

## 2. The disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award

The second prong of the constitutionality test asks the Court to consider the comparison between the amount of the punitive damages and the actual harm suffered. Notably, Defendant made no argument below that this prong favored

remittitur.  Instead, he ignored the guidepost completely.  The district court then curiously stated in its opinion below that the parties did not thoroughly brief this subject. That is simply not accurate.  Plaintiff had no reason to address a guidepost that Defendant was not arguing favored him, in a motion in which Defendant had the burden.  It was improper for the Court to sua sponte make an argument for Defendant on this matter.

Not only should the Court have not addressed this prong, but the manner in which it did is again contrary to the record.  The Court acknowledged that this guidepost is typically seen as a ratio in which the punitive damages may not exceed the compensatory damages by a certain amount.  When previously describing this guidepost, the Supreme Court has explained that

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In Haslip, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23-24. We cited that 4-to-1 ratio again in Gore. 517 U.S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id., at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, id., at 582, or, in this case, of 145 to 1.  [State Farm Mut Automobile Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003).]

43

Thus, while we know that double digit ratios between punitive damages and compensatory damages are perhaps difficult to sustain, single digit ratios generally are not.

Here, the court first erred in concluding that the ratio in this jury's award was 1:1. It was not. Recall, the jury's verdict in total was $80 million compensatory and $20 million punitive. It was a 4:1 ratio in favor of compensatory damages. That the trial court then eliminated $60 million in compensatory damages because of its erroneous liability analysis on municipal liability does not negate the fact that Mr. Blasingame incurred that degree of harm.

After falsely concluding that the ratio was 1:1, the Court then explained that while that award may appear to be constitutional on the surface (which is precisely why Defendant made no argument regarding this guidepost, the award was nonetheless unconstitutional. The Court stated that "[h]ere, the compensatory award is enormously high" and then concluded that because of that allegedly high compensatory award, a ratio of even 1:1 could not be sustained. That was error. Moreover, it was punishment of Mr. Blasingame for being so catastrophically harmed. The compensatory damage award that survived the Court's grant of JMOL in favor of the city was grossly inadequate in the eyes of the jury (and even defense counsel) to compensate Mr. Blasingame for his injuries. Again. defense counsel stated during closing argument that an award of $100 million could be proper if

liability was to be had.  That was correct.  The compensatory damage award of $20 million was not "enormously high."  It was inadequate.

By reducing the punitive damage award to $1 million, Plaintiff is left with a ratio of 80:1 of compensatory to punitive damages.  Zero authority supports such a ruling.  This guidepost went unargued by Defendant for a reason: to argue it supported overturning the punitive damage award is to entirely ignore the record and the law.

### 3.  The difference between the award and the civil penalties available

The remaining guidepost asks the deciding Court to consider the size of the punitive damage award compared to the civil or criminal penalties available under the law.  As the 1st Circuit has stated when discussing this guidepost, "[i]n drafting section 1983, Congress did not make any reference to the quantum of damages. We may, therefore, consider awards in similar cases to help determine if particular punitive damages in a given case appear excessive."  *Casillas-Diaz v Officer Romualdo Palau*, 463 F3d 77, 86 (1st Cir., 2006).

In arguing below that other decisions demonstrate the excessive nature of the punitive damage award in this case, Defendant cited to the outcome in *Jennings v Fuller*, ___F Supp 3d___; 2017 U.S. Dist. LEXIS 77945 (ED Mich, May 23, 2017), in which the jury awarded the Plaintiff $17.63 million in compensatory damages and $19 million in punitive damages. Those awards were reduced by the District Court-

after a timely filed motion- to $5 million and $6 million, respectively. Yet, the Defendants in *Jennings* did not render the Plaintiff a quadriparetic. Instead, that opinion reflects that the Plaintiff never had a surgery as a result of his injuries, underwent minimal physical therapy and returned to living his life. This jury was attempting to deter a far different consequence than the *Jennings* jury.

That there are not a multitude of comparable cases where police officers have rendered homeless men quadriparetics and then destroyed the evidence of their conduct afterwards should not be a basis for reducing this punitive damage award. There are other instances where public officials have been subject to large punitive damage awards that were not reduced. For example, in *Reeves v. Town of Cottageville*, #2:12-cv-02765, U.S. Dist Ct., (D.S.C. Oct. 21, 2014), a jury awarded a Plaintiff in an excessive force case $7.5 million in compensatory damages and $90 million in punitive damages ($60 million against the city and $30 million against the officer) (Doc. 164). The case was settled for a confidential sum without those awards ever being reduced (Doc. 205).

As Defendant's brief below acknowledged (albeit in a footnote), in *S.T. v. Isbell*, No. 2:09cv616-MHT (M.D. Ala. 2010), the jury awarded the minor Plaintiff $10 million in compensatory damages and $10 million in punitive damages. While there are no trial transcripts or extensive opinions to analogize the facts of that case, the damage awards were not reduced in any way in that case. Counsel did view the

complaint in that matter, which is nine pages in length and contains very little description of the Defendant's specific conduct or the nature of the Plaintiff's injuries.  Again, it was Defendant's burden in this motion to show that relief is warranted and *S.T. v. Isbell* fails to accomplish that.

In *Estate of Moreland v Dieter*, 395 F3d 747 (7th Cir., 2005), the 7th Circuit affirmed $27.5 million in punitive damages in an excessive force case where there were $29 million in compensatory damages.  In doing so, the Court stated that "[t]he defendants have not identified a single appellate case questioning the constitutionality of a punitive damages award that is a fraction of the underlying compensatory damages award. Nor have we." *Id*. at 757. The same is true here.

As provided above, there have been other 1983 cases with similar or higher punitive damage awards which were never subject to reduction.  Defendant failed to show that this guidepost favored a reduction.  As the 5th Circuit has previously stated in an opinion binding upon this Court,

> In order for an award to be reduced, "the verdict must be so gross or inordinately large as to be contrary to right reason." *Machado v. States Marine-Isthmian Agency, Inc*., 411 F.2d 584, 586 (5th Cir. 1969). The Court "will not disturb an award unless there is a clear showing that the verdict is excessive as a matter of law." *Anderson v. Eagle Motor Lines, Inc*., 423 F.2d 81, 85 (5th Cir. 1970). The award, in order to be overturned must be "grossly excessive" or "shocking to the conscience." *La-Forest v. Autoridad de las Fuentes Fluviales*, 536 F.2d 443 (1st Cir.1976). [*Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295 (5th Cir. Unit B 1981).]

The verdict at issue in this case was large because the injuries Defendant caused

47

were catastrophic and the conduct at issue was reprehensible. The Court's conclusion that there are not comparable awards that have survived judicial scrutiny is both incorrect and reflects the Court's continued failure to appreciate the jury's role in determining the scope and availability of damages.

### III. The District Court erred in denying Plaintiff's Motion for Relief from Judgment relative to his claim under O.C.G.A. § 42-5-2

Just as the District Court erred in concluding that Defendant was entitled to judgment as a matter of law relative to the claim of municipal liability, it likewise erred in concluding that Defendant was not statutorily responsible for Plaintiff's medical bills. Georgia law provides that the responsible governmental entity shall pay for the necessary medical expenses of inmates in their custody. *See* O.C.G.A. § 42-5-2.

The Georgia Court of Appeals has explicitly held that "when officers subdue a subject, render first aid, and transport him to the hospital, physical custody is shown." *Macon-Bibb County Hosp. Auth. v. Reece*, 228 Ga. App. 532, 534 (1997).

In *Cobb*, the individual "was shot and incapacitated by one Cherokee County deputy, placed in restraints by another, and taken in restraints to the hospital in a county vehicle that was escorted by a sheriff's department vehicle. This was sufficient to place [the individual] in the physical custody of the deputies." 221 Ga. App. at 498.

Here, Defendant Grubbs testified that Mr. Blasingame was in custody beginning the moment he was tasered and that had Mr. Blasingame not been injured, he would have been arrested and taken to jail. (Tr, pp 1079-1080.) Indeed, while Mr. Blasingame was still at the hospital two months after this incident, he was served with two citations that each referenced that he was in detention at Grady Hospital, which apparently contains a section for inmates or detainees (Tr, pp 558-559).

The Georgia Court of Appeals has long held that the term "inmate" as used in O.C.G.A. § 42-5-2 applies "not only [to] a person who has been convicted of an offense, but also a person who is detained by reason of being charged with a crime." *Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty*., 207 Ga. App. 530, 531-532 (1993).

As explained by a court in this federal district, "Georgia courts have held that pretrial detainees who are in custody by reason of having been charged with a crime qualify as 'inmates' for purposes of § 42-5-2, even if the detainee is released on his own recognizance while in the hospital. Those who would have been placed into custody but for their injuries have also been held to qualify as 'inmates,' though they were not yet detained in a detention facility." *Saylor v. Barrow County*, 2010 U.S. Dist. LEXIS 154614, at *13 (N.D. Ga. Mar. 9, 2010) (internal citation omitted).

In *Cherokee County v. N. Cobb Surgical Assocs., P.C*., 221 Ga. App. 496, 497 (1996), the Georgia Court of Appeals determined that an individual who was shot by police officers during his arrest and brought to the hospital for urgent treatment

49

was an "inmate" under O.C.G.A. § 42-5-2. Following, *Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty.*, 207 Ga. App. 530, 532 (1993), the Court determined that if not for his gunshot injuries, he would have been brought to jail and thus was properly considered an "inmate" under the intent of the statute. *Id*. at 498-499. ("In a like manner, we hold that Cherokee County is responsible for McFarland's medical care because he was injured while being taken into physical custody by the county sheriff's department and who, but for the seriousness of his injuries, would have been placed in the county's detention facility.").  Like *Cobb*, Mr. Blasingame was injured by an officer while he was detaining or arresting Mr. Blasingame. Grubbs called for EMS and monitored Mr. Blasingame until Mr. Blasingame was transferred to the hospital where he remained in custody. Accordingly, Mr. Blasingame was in custody when he was injured and thus meets this statutory requirement.  His estate is entitled to payment of past and present medical expenses incurred for injuries sustained while he was in the custody of City of Atlanta.

## IV.  The District Court erred in denying Plaintiff's motion for costs and fees as the prevailing party.

Finally, the District Court erred in denying Plaintiff's motion for attorney fees. Plaintiff acknowledges that the District Court essentially held Plaintiff's motion in abeyance.  The Court recognized that Plaintiff was the prevailing party at trial, but elected to wait until the conclusion of the appeal before it ruled on the motion.

Plaintiff included the denial of that motion in his claim of appeal in order to ensure it was properly preserved.

48 U.S.C. § 1988(b) provides that in certain civil rights actions, including those brought under 42 U.S.C. § 1983, the district court, "in its discretion, may allow the prevailing party a reasonable attorney's fees as part of the costs." *Hensley v. Eckerhart,* 461 U.S. 424, 426 (1983).

This Court recognizes that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111-12 (1992). There is no doubt that the Plaintiff is a prevailing party under this standard.

Relatedly, it is well established that a plaintiff who has won substantial relief should not have the attorney's fees reduced simply because the district court did not adopt each contention or claim raised, so long as the claims involve a common core of facts or are based on related legal theories. *Hensley,* 461 U.S. at 435. Plaintiff succeeded before the jury and this Court on his claim of excessive force against Defendant Grubbs; and then the Court set aside the jury's verdict against the City of Atlanta. Plaintiff is still entitled to fees and costs on all the work completed. Consequently, this matter must be remanded for the Court to determine the amount of costs and fees to which Plaintiff is entitled, as was fully briefed below.

51

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that this honorable Court reverse the district Court in all the ways discussed herein.  Mr. Blasingame demanded a jury trial, which he was entitled to under the United States Constitution.  What he instead received was a bench trial that amounted to a miscarriage of justice.  The district court found there to be no evidentiary errors, no instructional errors and no improper influence resulting from passion or prejudice.  Yet, the court nonetheless determined that its view of the facts and the damages was superior to that of the jury.  Moreover, the court improperly provided a Defendant who had unquestionably missed motion deadlines with a parachute to save him from his own tardiness at Mr. Blasingame's significant expense.  What has occurred thus far in this case is an affront to all notions of fairness in our civil justice system. Relief is required.

Respectfully submitted,

*/s/ Christopher P. Desmond*
Christopher P. Desmond (P71493)
Ven Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
Tel: (313) 324-8300
cdesmond@venjohnsonlaw.com
*Counsel for Plaintiff-Appellant*

Dated:  January 10, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type-volume limitation provided in F.R.A.P. 32(a)(7)(B).  The foregoing brief contains 12,988 words of Times New Roman (14 point) proportionate type.

<u>/s/ Christopher P. Desmond</u>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 10, 2025, I electronically filed the foregoing paper with the Clerk of the Court using ECF system which will send notification of such filing to all counsel of record in this matter.

<u>/s/ Christopher P. Desmond</u>